**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DO NO HARM,**
2825 E. Cottonwood Pkwy., Ste. 500
Salt Lake City, UT 84121

      *Plaintiff,*

v.

**UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES,**
200 Independence Ave., SW
Washington, DC 20201;

**ROBERT FRANCIS KENNEDY, JR.,** in his official
capacity as Secretary of Health and Human
Services,
200 Independence Ave., SW
Washington, DC 20201;

**UNITED STATES HEALTH RESOURCES AND
SERVICES ADMINISTRATION**,
5600 Fishers Lane,
Rockville, MD 20857; and

**THOMAS J. ENGELS**, in his official capacity as
Administrator for the Health Resources and
Services Administration,
5600 Fishers Lane,
Rockville, MD 20857,

      *Defendants.*

Case No. 1:26-cv-01062

**COMPLAINT**

1.     The Constitution's equal-protection principle bars the federal government from discriminating based on race or ethnicity. Yet HHS administers the Native Hawaiian Health Scholarship Program, which facially excludes all races other than "Native Hawaiian." *See Native Hawaiian Health Scholarship Program School Year 2026-2027 Application & Program Guidance* 6, HRSA, perma.cc/9AFH-VSB7 (archived Jan. 31, 2026); 42 U.S.C. §11709(a)(2) ("[e]ligibility" limited to "Native Hawaiians").

2. The Program is a valuable opportunity: Awardees receive "generous" financial aid including tuition and a stipend, and in return they provide medical care in Hawaii. *See Native Hawaiian Health Scholarship Program – How It Works*, perma.cc/KZF8-RBTX (archived Feb. 1, 2026). But due to the government's racial exclusion, races other than Native Hawaiians need not apply.

3. An exclusion of non-Native Hawaiians is "race-based." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000); *see also Constitutionality of Race-Based Department of Education Programs*, 49 Op. O.L.C. ___ at 23 (Dec. 2, 2025) (explaining that "Native Hawaiian" is a racial classification). "Racial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). It "demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220 (cleaned up).

4. Plaintiff, Do No Harm, has members who are eligible and competitive applicants for the Program. They wish to compete for these generous scholarships and hope to make a difference to underserved communities in Hawaii. But because of their race, their applications were and remain barred.

5. There is no valid reason to make federal scholarships turn on race or ethnicity. "Eliminating racial discrimination means eliminating all of it." *Id.* at 206. This Court should declare that the Program's racial requirements are unconstitutional.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction because this case arises under the Constitution of the United States. *See* 28 U.S.C. §1331.

7. Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because HHS and its Secretary reside in the District of Columbia. HHS and its Secretary also "perfor[m] a significant amount of [their] official duties" in the District of Columbia. *McGrone v. Austin*, 2022 WL 888194, at *4 (D.D.C. Mar. 25); *accord Lamont v. Haig*, 590 F.2d 1124, 1128 n.19 (D.C. Cir. 1978) (explaining that

an official capacity defendant's residence under §1391(e)(1) is where the defendant's "official duties are performed"). The other defendants are under HHS.

8. Defendants cannot invoke sovereign immunity. The APA's waiver of sovereign immunity extends to constitutional claims. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *accord Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he waiver in §702 is not limited to claims brought pursuant to the review provisions contained in the APA itself." (collecting cases)).

**PARTIES**

9. Plaintiff, Do No Harm, is a nationwide membership organization dedicated to protecting healthcare from radical, divisive, and discriminatory ideologies and policies. DNH was founded in 2022, and it is recognized by the IRS as a 501(c)(3) tax-exempt nonprofit. Its mission and outreach are highly public and detailed on its public facing website.

10. DNH brings this lawsuit in a representational capacity on behalf of its members who would have standing to sue on their own. Its standing members voluntarily join the organization, support its mission, pay dues, authorize the association to represent their rights in litigation, receive updates and can give input and direction on the litigation, and are represented by DNH in good faith.

11. Defendant U.S. Department of Health and Human Services is an executive agency of the federal government responsible for the enforcement and administration of the Program.

12. Defendant Robert Francis Kennedy Jr. is the Secretary of the U.S. Department of Health and Human Services. The Secretary is responsible for the administration and enforcement of the Program. *See Application & Program Guidance* 39; 42 U.S.C. §11709. He is sued in his official capacity.

13. Defendant U.S. Health Resources and Services Administration is a federal agency within HHS that administers the Program.

14. Defendant Thomas J. Engels is the administrator of the U.S. Health Resources and Services Administration. He is sued in his official capacity.

## BACKGROUND

**I.    The Program discriminates based on race and ethnicity.**

15.    Since 1992, Congress has instructed that "the [HHS] Secretary shall provide funds … for the purpose of providing scholarship assistance to students who … are Native Hawaiians." 42 U.S.C. §11709(a).

16.    The Program is a "generous" scholarship. *How it Works*. Per the federal government, the purpose of the Program "is to provide federal financial support for Native Hawaiians who are students at health professions schools." *Application & Program Guidance* 3. The government has awarded "more than 300" scholarships to date. *Apply to the Native Hawaiian Health Scholarship Program*, HRSA, perma.cc/4T37-XD87 (archived Mar. 30, 2026).

17.    HHS, via HRSA, administers the Program through "a cooperative agreement with" a nonprofit organization. *Application & Program Guidance* 32; 42 U.S.C. §11709(a). Under the terms of that agreement, the nonprofit "will recruit eligible applicants" and is "responsible for reviewing the applications, interviewing eligible applicants, and providing HRSA with a list of recommended applicants." *Application & Program Guidance* 32.

18.    Once the nonprofit finishes its review, HRSA considers the recommendations and makes the final decisions on who gets the scholarships. HRSA then pays out scholarship funds to the schools and students. *See How it Works*.

19.    To those granted a scholarship, the benefits are substantial. Successful applicants receive funds to support school tuition and fees, a monthly "stipend to cover living expenses," and additional funds to cover other educational expenses such as "books, clinical supplies, instruments, etc." *Application & Program Guidance* 5. They also benefit from a "mentor in the same (or a similar) field," "[l]icensure & service placement preparation," and "[n]etworking & professional development opportunities." *See* Mauli Ola Malamalama, *About the Program*, perma.cc/CN2B-BF87 (archived Jan. 31, 2026).

20.     In return, scholarship awardees serve "full-time in medically underserved areas in Hawai'i" for two-to-four years. *Id.*

21.     But these scholarships are not available to everyone. Instead, the Program categorically excludes all races other than "Native Hawaiians." *Application & Program Guidance* 6. The Program defines "Native Hawaiian" as "descendant[s] of the aboriginal people, who prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii." 42 U.S.C. §11711(3); *Application & Program Guidance* 6. And it demands proof of Hawaiian ancestry via applicants' birth certificates. *See* Mauli Ola Malamalama, *How to Apply*, perma.cc/F6SW-3QRT (archived Jan. 31, 2026). If the birth certificate does not indicate Hawaiian ancestry, then the only way to be eligible is for the applicant to "include certified birth certificates of each family member until it verifies Native Hawaiian Ancestry or states 'Hawaiian' on the birth certificate." *Id.*

22.     Because this definition of Native Hawaiian requires only one Native ancestor, it equally includes a student whose mom is Native Hawaiian (50% Native Hawaiian) and a student whose great-great-great-great-great-great-great grandmother is Native Hawaiian (0.2% native Hawaiian).

23.     The Program justifies this "race-based" exclusion, *Rice*, 528 U.S. at 517, based on the debunked theory of racial concordance: "[T]he unique health needs of Hawaiian communities," it asserts, require "quality, culturally competent health services." *Native Hawaiian Health Scholarship Program*, perma.cc/HW2Y-T44A (archived Jan. 31, 2026).

24.     But medical research "does not support" the idea that patients benefit from having doctors of the same race. *See* I. Kingsbury & J. Greene, *Racial Concordance in Medicine: The Return of Segregation* at 3, perma.cc/4SZ5-3DH3 (archived Mar. 22, 2026). When the entirety of the research base is considered—including systematic reviews synthesizing dozens of studies—the results are overwhelmingly neutral. Most analyses find no meaningful relationship between patient–physician racial matching and communication, utilization, or clinical outcomes. As one review concluded,

5

"race/ethnicity concordance with their physician does not appear to influence the quality of communication for most patients." *Id.* at 8.

25. Indeed, even the most frequently cited studies fail to establish a reliable causal effect. For example, one influential study from Florida relies on observational data in which patients were not randomly assigned to physicians. And the results of that study "shrin[k] by almost 75% when controls are added." *Id.* at 31. So any apparent effects are likely driven by underlying differences such as patient health or physician specialization—not race. Thus the "idea that doctors see patients as members of a racial group rather than as individuals fails to withstand scrutiny—and it promises a return of racial segregation." *Id.* at 36.

26. In medicine, as in life, "separate but equal" is wrong, immoral, and unjustified.

## II. The Program harms members of Do No Harm.

27. DNH has several members who are able and ready to apply for the Program, once a court orders adequate relief against the Program's racial requirements.

28. For example, Member A is entering an accredited B.S.N. program in the fall. She is white and will be engaged in her academic pursuits full time.

29. Member A lives with disabilities; and through those experiences she understands the importance of helping underserved communities. She has invested significant time and resources working and volunteering to help the disadvantaged, including by applying for other government programs that serve the needy far from home. She would find the opportunity to provide medical care in Hawaii deeply meaningful.

30. Member A has no private source of wealth to cover her tuition expenses, and she shoulders a significant financial burden due to her medical bills. A scholarship from the Program would help her focus on her education, her health, and her family before bringing her skills to Hawaii.

31. Prior to the expiration of the March 20, 2026, deadline, Member A attempted to apply for the Program. But after she disclosed that she was not Native Hawaiian, she received a message

that she was not "eligible for any programs."



If Member A had just one family member of Hawaiian descent hundreds of years ago, she would have

the requisite blood-quantum to be the "right" race and she would be eligible. *See* 42 U.S.C. §11711(3);

*Application & Program Guidance* 6. But she does not.

32.    Members B and C are medical students engaged in their academic pursuits full time.

Like Member A, neither is Native Hawaiian.

33.    Like Member A, Member B has engaged in many acts of service for underserved

communities. He would welcome the opportunity to bring his skills to serve the needy in Hawaii.

34.    Member C has a deep respect for Hawaiian culture and believes in the importance of

helping underserved communities. She would cherish the chance to bring her skills to Hawaii.

35.    Like Member A, prior to the expiration of the March 20, 2026, deadline, Members B

and C attempted to apply for the Program. But like Member A, they were barred after disclosing they

were not Native Hawaiian.

36.    Members A, B, and C are able and ready to apply to the Program again, including in

the next cycle that opens in early 2027. They continue to satisfy all the objective minimum criteria,

aside from race. And their sincere interest in the program has not waned. If a court ordered

Defendants to make the program equally open irrespective of race, Members A, B, and C would apply.

7

**CLAIM FOR RELIEF**

37.    Plaintiff repeats and realleges the allegations above.

38.    The Fifth Amendment's Due Process Clause includes an equal-protection principle that binds the federal government. *See Bolling v. Sharpe*, 347 U.S. 497, 500. That principle is no less strict than the Fourteenth Amendment's Equal Protection Clause. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995). Under our Constitution, "any person, of whatever race, has the right to demand that any governmental actor . . . justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* That principle stems not only from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizenship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence. *See United States v. Vaello Madero*, 596 U.S. 159, 171-72 (2022) (Thomas, J., concurring).

39.    The Program facially discriminates based on race and ethnicity. *Supra* ¶¶21-23. The program therefore must satisfy strict scrutiny by employing measures that are "narrowly tailored" to "further compelling governmental interests." *SFFA*, 600 U.S. at 206-07. Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The Program's categorical racial exclusions cannot clear this bar for several reasons, including the following.

40.    The Program asserts interests in catering to "the unique health needs of Hawaiian communities" which require "quality, culturally competent health services." Neither interest is one of "only two compelling interests that permit resort to race-based government action": "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *SFFA*, 600 U.S. at 207.

41.    Even if it served a compelling interest, the Program's race-based requirements are not

8

narrowly tailored.

42.    The Program's categorical exclusion of some races in a competitive program with limited funding treats race "as a negative." *Id.* at 218 (cleaned up).

43.    The Program's use of race and ethnicity also "lack[s] a logical end point." *Id.* at 221 (cleaned up). As the program is currently constituted, the racial exclusion is set in stone—regardless of the needs of Native Hawaiians or the evidence that racial concordance does not generate better health outcomes. *See Racial Concordance in Medicine.* And it has continued since at least 1992.

44.    The interests motivating the Program cannot "be subjected to meaningful judicial review." *SFFA*, 600 U.S. at 214. There is no way for "courts . . . to measure any of these goals," *id.*, such as when the median medical encounter is sufficiently "culturally competent," *Native Hawaiian Health Scholarship Program.* And even if these goals could be measured, courts have no basis for assessing "when they have been reached." *SFFA*, 600 U.S. at 214.

45.    The Program also "fail[s] to articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* at 215. Program eligibility turns on whether one is the "right" race to purportedly allow them to provide better or more "culturally responsive" medical care, excluding someone who is not Native Hawaiian but spent their entire life living in Hawaii and including someone who is 1/200th Native Hawaiian but never even visited the island. *See About the Program.* Any "connection" between race and care relies on nothing more than "impermissible racial stereotyp[ing]." *SFFA*, 600 U.S. at 220. As explained above, there is no scientific basis for the belief that patients benefit from having doctors of the same race. *Supra* ¶¶24-25. Such beliefs rely on "pernicious stereotype[s]" that suggest "members of the same racial group—regardless of their age, education, economic status, or the community in which they live—[are all] alike." *SFFA*, 600 U.S. at 219-20.

46.    The Supreme Court has "repeatedly explained" that under the Constitution "citizens

9

[must be treated] as individuals, not as simply components of a racial … or national class." *Id.* at 223. Indeed, "[c]arried to its logical extreme, the idea that [Native Hawaiian patients] are better off with [Native Hawaiian doctors] could lead to the very system the Court rejected in *Brown v. Board of Education*," when it struck down "separate but equal." *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 276 (1986) (plurality op.); *see also Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954).

## PRAYER FOR RELIEF

Plaintiff asks the Court to enter judgment in its favor and to grant the following relief:

a.    A declaratory judgment that the Program, as currently constituted, is unconstitutional;

b.    A preliminary and permanent injunction prohibiting the Secretary from enforcing or applying the Program's race-based requirements;

c.    All other relief that Plaintiff is entitled to, including attorneys' fees and costs.

Dated: March 30, 2026

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy
(D.C. Bar #489651)
Cameron T. Norris
  *Lead Counsel*
Frank H. Chang
(D.C. Bar #1686578)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com

*Attorneys for Plaintiff*